# CHARLESTON

## POLING *et al.* *v.* TETER *et al.*

Submitted March 10, 1908.   Decided March 17, 1908.

1. CORPORATION—*Reorganization*—*Contract*—*Construction*—*Right to Stock.*

   Members of an insolvent corporation, holding three-fifths of the stock thereof, having agreed, with former holders of the residue of the stock, in consideration of their assignment of the same to strangers, to divide equally with them any profit in money or stock derived by the former from the sale of the property of the corporation or consolidation thereof with any other corporation, become heavy stockholders in a new corporation which purchases from the old one, all its property and assets, for and in consideration of the assumption and payment of its indebtedness, under a resolution unanimously adopted by the stockholders of the latter long be-

fore the date of the agreement to divide profits, after repeated efforts had been made to sell the plant at a profit and when its debts threatened destruction of the company and bankruptcy of the stockholders as endorsers, sureties and guarantors of its debts; and suit is brought to compel a division of the stock so taken in the new corporation as profits derived from the stock of the old one. *Held*: That the stock in question was procured partly, if not wholly, upon new and independent considerations, and is not profit, divisible under the agreement. (p. 118.)

(ROBINSON, JUDGE; Absent.)

Appeal from Circuit Court, Barbour County.

Bill by David H. Poling and others against Charles F. Teter and others. Decree for defendants, and plaintiffs appeal.

*Affirmed.*

J. HOP WOODS, for appellants.

FRED O. BLUE, for appellees.

POFFENBARGER, PRESIDENT:

The only important inquiry raised on the appeal of David H. Poling and Columbus Kelly, from a decree pronounced in the chancery suit brought by them against Charles F. Teter, James E. Hall, Alston G. Dayton, J. C. Menoher, John Kerr, The Hall Coal Company, The Philippi Coal Mining Company, F. O. Blue, Trustee, and A. Thompson, is whether the defendants, Charles F. Teter, James E. Hall and Alston G. Dayton, as holders of three-fifths of the capital stock of the Hall Company, realized any profit, from the sale of the property and assets of the Hall Coal Company to the Philippi Coal Mining Company. If they did, they were admittedly bound to make an equal division thereof with the plaintiffs, Poling and Kelly, by virtue of the following agreement:

"Nov. 2, 1897. We hereby agree with C. Kelley and D. H. Poling, that in consideration, of their assignment, their stock, in the Hall Coal Coampany, to J. C. Menoher, and John Kerr, that when said companies property is sold, or the consolidation of said Hall Coal Company, with the English Syndicate, or any other transfer of said property, which is now contemplated, or may hereafter be made, is consummated, then the said Poling and Kelly, are to share their equal pro-

portionate part, of all profits, in stock and money, or either, upon such consideration or transfer of said property, as may be mutually agreed upon, between them and us.   C. F. Teter, Jas. E. Hall, Alston G. Dayton."

Though this agreement is predicated on an assignment, by Kelly and Poling, to Menoher and Kerr, of stock in the Hall Coal Company, contemporaneously or previously made, and the plaintiffs themselves in their testimony, admit such assignment by a separate paper and the cessation of their relation to the company as stockholders, and that they were looking thereafter for nothing more than a share of the profits, if any, that should be derived or acquired by Teter, Hall and Dayton, from the remaing three-fifths of the stock, an effort was made, in the course of the examination of the witnesses and otherwise, to treat the plaintiffs as the equitable owners of the stock they had assigned to Menoher and Kerr. For any such claim there is no basis in the evidence, and the inquiry will be limited to the question of the profit accruing to Teter, Hall and Dayton from the stock of the Hall Coal Company.   The agreement above quoted may have made them equitable owners of two-fifths of the sharses held by Teter, Hall and Dayton, but that question need not be decided since, by the terms of the agreement, they are entitled to no relief, if no profit was realized on those shares.

About the year 1895, Columbus Kelly, one of the plaintiffs began to interest himself in the organization of a coal mining enterprise near the town of Philippi, in Barbour county. From time to time, other persons became associated with him, and, for the prosecution of the work, the Hall Coal Company was incorporated on the 22nd day of January, 1896, by J. E. Hall, Charles F. Teter, Columbus Kelly, D. H. Poling and G. W. Hoover, with an authorized capital stock of $50,-000.00, of which $500.00 had been subscribed and $50.00 paid thereon, each of the subscribers having taken one share of the par value of $100.00 and made the statutory payment of ten per cent.   No additional stock was ever issued.   Hoover subsequently sold or surrender his share to the company and it was afterwards sold to A. G. Dayton.   In the name of this corporation, about 355 acres of the coal in certain land situate a mile or two from Philippi, on the Grafton & Belington division of the Baltimore & Ohio Railroad, was purchased,

but not all paid for. For some of it, deeds were taken in which vendors' liens were reserved and the balance was held under executory contracts of purchase. The land on which the mine was opened, part of the Kelly estate, in which Columbus Kelly, one of the stockholders, was interested as an heir, was held under a contract of purchase and only a small part of the purchase money had been paid. Options or deeds in escrow for some four or five thousand acres of additional coal in place were taken. In 1897, though the mine had been opened and worked, and machinery installed, the affairs · of the company were in a deplorable condition. Very little of its coal had been paid for and it was heavily indebted for labor, machinery and implements. A great many of the options, practically all of them, had expired, and many of the deeds that had been delivered in escrow had been withdrawn. Dayton, Hall and Teter had made themselves personally liable on its paper for large sums of money. Kelly and Poling, men of less financial ability, were burdened in the same way, but for a much smaller amount. Under these embarrassing conditions, many schemes were devised to relieve the situation. Repeated and persistent efforts were made in the year 1897 and probably prior to that date, to sell the property and pay off the debts, and, if possible, realize profits from it. Mr. Teter had made a trip to Liverpool, England, and secured a contract for the sale of this and other properties in that community, but it failed. Efforts were made to enlist Pennsylvania capitalists, at Pittsburg, Philadelphia and elsewhere, but all these were abortive. In May, 1897, the Philippi Coal Mining Company was incorporated with an authorized capital stock of $500,000.00, of which $600.00 was subscribed by E. Theiland of Phiadelphia, J. C. Menoher, John Kerr of Greensburg, Pa., and James E. Hall, A. G. Dayton and C. F. Teter, of Philippi, West Virginia, on which they had paid $60.00, ten per cent of the amount subscribed. On the 16th day of June, 1897, a resolution was adopted by the stockholders of the Hall Coal Company, authorizing a conveyance of all its property, franchises, rights and privileges to the Philippi Coal Mining Company, for and in consideration of the assumption by the latter of all the outstanding debts of the former, due to land owners for purchase money of coal, to miners and employees for

labor and services and to other persons for purchase money of machinery, cars, tipple, live stock and materials, and a deed, accordant with the resolution, was thereupon executed and unanimously approved by the stockholders and delivery thereof directed to be made by Hall, the President. Though this deed was dated June 16, 1897, and acknowledged August 7, 1897, it was not delivered until sometime afterwards. No doubt the new corporation to which it was proposed to sell all of the property and assets of the Hall Coal Company was organized with the intention to make it the means or instrumentality by which to enlist strangers in the enterprise and bring about a settlement of the indebtedness of that company and the acquisition of the additional property on which it had options of purchase, and so not only pay its debts and effectuate its purpose, but make for its stockholders a profit, if possible, provided this was not done by a sale to the "English Syndicate" or somebody else. It is highly probable the sale to the Philippi company without profit was intended as an alternative to be resorted to only in case of necessity—failure to make a better sale. At the time of the authorization of the sale without profit, the indebtedness was large, and it continued to increase. Nearly two years later, April or May, 1899, when the sale was made, it amounted to about $40,000.00. Kelly himself says that he and Teter estimated it at 42 or 43 thousands dollars. In the meantime, all efforts to make a more advantageous sale than that proposed in the resolution and deed of June 16, 1897, had failed, and the stockholders were on the brink of financial disaster. The "English Syndicate" had gotten out of their contract. No sale to any other person had been made or was in prospect. Capital had not been raised through the Philippi company with which to purchase the property at any price. In this gloomy state of affairs, one of the parties found a way out by the assistance of a personal friend.

Mr. Thompson, a resident of Davis, Tucker county, and a man of large means and extensive business experience, went over the property in company with Mr. Dayton, and, seeing the embarrassment under which the interested parties were laboring, agreed to relieve them. After returning home, he sent Dayton checks for $16,000.00 with directions to purchase and pay for about 2,700 acres of coal adjoining the

Hall company's holdings, and on which the expired options had been taken, and have the same conveyed to Menoher in trust for him, Thompson. This was done. Then Thompson and Dayton holding the deed of the Hall Coal Company for all of its property and the deeds for the additional coal, all of which it was proposed to convey to the Philippi Coal Mining Company, went to Philadelphia and negotiated a loan from the Guaranty Trust Company of $40,000.00, which netted the company $39,000.00. Mr. Thompson guaranteed the payment of this loan by his personal endorsement. He then loaned the Philippi Coal Mining Company $10.000.00 himself. Thereupon, he conveyed, or caused to be conveyed to that company, the coal area he had purchased, and the deed from the Hall Coal Company was also delivered to it. A deed of trust was executed by the Philippi Coal Mining Company to indemnify Thompson as surety or guarantor for the loan of $40,000.00 and to secure the payment of the $10,000.00 loan which he had made to the company. Out of the money so procured a large part of the indebtedness of the Hall Coal Company was paid, but not all of it. Part of the purchase money for additional coal acquired by Mr. Thompson was repaid to him out of the same. Additional stock of the Philippi Coal Mining Company was issued so as to make the entire issue $100,000.00, all of which was delivered to Dayton as trustee, to be held until such time as Thompson should determine to whom and in what amounts it should be delievered as owners thereof. All of the parties say Thompson made it a condition of his investment and undertaking on behalf of the company, that Teter, Hall, Dayton, Menoher and Kerr should become and remain stockholders and directors and give to the business their personal efforts and attention, he himself having had no experience in coal mining, and Menoher being a practical man in that line of business. Subsequently, he allotted to these five men $10,000.00 each of the capital stock and reserved for himself $50,000.00 of it. They paid nothing for it. He says it was given them as a means of interesting them in, and binding them to, the prosecution of the interprise into which he had put so much money and on account of which he had so heavily endorsed, to the end, and with the view, that they would bestow upon it their attention, care and labor. Subsequently, it became necessary to raise more money and

a loan of $25,000.00 was secured from Miss S. Maude Thompson, the daughter of Albert Thompson, to secure the payment of which another deed of trust was executed. All of this money was borrowed and still there remained indebtedness. Thereupon Mr. Thompson called a meeting of the stockholders, and, after having told them that no more money could be borrowed upon the property, he insisted that the stockholders, he being the largest of them, advance ratably, a sufficient amount of money to satisfy the needs of the company, something like forty per cent, or about $40,000.00. Thereupon, Messrs Hall and Teter, acknowledging their obligation to do so, said that, in view of a loss which Mr. Hall, father-in-law of Teter, had sustained, it would be difficult, if not impossible, for them to contribute their shares, and asked Thompson to take the stock off their hands, saying it would be an accomodation, if he could take it as a gift and relieve them from their obligation to make the advancement. This, he reluctantly did. He had previously purchased from Kerr and Menoher the stock he had alloted to them, having found them, too, unwilling to adhere to their agreement to stay in the company and give it their attention, and inclined to dispose of the stock to outside persons. In order to avoid embarrassment in this way, he had paid each of them $5,000.00 for his stock and in satisfaction of debts against the company for money advanced and services rendered. Dayton retained his stock and complied with his agreement to contribute.

The charge that profits were realized by Teter, Hall and Dayton on their three shares of the stock of the Hall Coal Company is predicated, first, on the allotment or assignment to them of $30,000.00 of the stock of the Philippi Coal Mining Company, and, second, an alleged surplus of $10,000.00, part of the $50,000.00 loan, remaining after the payment of the indebtedness of the Hall Coal Company. Having found against both of these contentions, the circurt court denied a reference to a commissioner to take an account and dismissed the bill.

By the assignment of the stock to Menoher and Kerr, the plaintiffs ceased to be stockholders of the Hall Coal Company, and they never were stockholders of the other corporation. The consideration for their assignment was the agree-

ment on the part of Teter, Hall and Dayton to divide with them such profits as might accrue to them as holders of three-fifths of the stock of the Hall Coal Company, by a sale of its property and assets to the "English Syndicate," or some other person or persons or consolidation thereof with some other company. Neither a sale nor a consolidation would have made them stockholders. It simply enabled them to call upon the parties who signed the agreement for a division of their profits in kind, whether they happen to be in the form of money or stock. In the event of profits acquired by Teter, Hall and Dayton, in the form of stock, the obligations was imposed primarily upon them to assign to the plaintiffs two-fifths thereof, and, secondarily, upon the corporation to recognize the assignments and admit the assignees to membership as stockholders. But the profits, as to which such obligations could arise, must have accrued from the stock of the Hall Coal Company. That company, being totally insolvent, and keeping its creditors off of it by means of the personal endorsements and guaranties of its stockholders, conveyed all of its property in consideration of the assumption of its indebtedness by the purchaser. The contract, solemnly evidenced by a resolution adopted by the stockholders and the deed of the corporation, was made with the full knowledge and unanimous consent of all the stockholders including the plaintiffs. No doubt a more advantageous sale was contemplated when the agreement of November 2, 1897, was made, and, if it had been, the plaintiffs would have been clearly entitled to share in the profits. The money borrowed by the Philippi company cannot be considered profits in any sense. It was not borrowed upon the Hall Company property. It was borrowed upon the faith of that and more than 2500 acres of additional coal, purchased by Thompson and conveyed to the Philippi company. It was not borrowed by the Hall company, but by the Philippi company. It was borrowed money, representing indebtedness, not profit at all. Nor was it intended to represent the purchase money of the Hall company property, though a large part of it was applied to the payment of its debts, which had been converted into debts of the other company by its assumption of the payment thereof. If, after the payment of all these debts, a surplus had remained, it would not have been a profit to the

Hall company. According to the letter of the contract of sale, no profit could accrue to that company. Payment of its debts only was the consideration expressed in the resolution and the deed. The Philippi company could apply this surplus to any of its corporate purposes, such as operating expenses, or the installation of a company store.

The payment of the Hall company's indebtedness and sequential relief of its stockholders from personal liability therefor by reason of their endorsements, suretyships and guaranties, could be obtained only by acceptance of such terms as Mr. Thompson saw fit to impose. He would neither buy coal, nor advance money nor guarantee a loan, unless the five men who were then stockholders of the Hall company and the Philippi company would remain in the latter as stockholders in such amounts as he should designate, and agree, in case of necessity, to advance sums of money, proportionate to the stock they should hold, for the prosecution of the business of the company. Their membership in the new corporation was procured or taken, not alone, if at all, in consideration of any interest they had in the old one, but upon new considerations, their obligation to the purchasing company as stockholders, liable to be legally called upon by creditors to pay the par value of the stock assigned to them in case of failure of the enterprise and insolvency of the corporation, and their agreement with Thompson to advance money in proportion to their stock to ward off such failure, in case of necessity, and to give their labor, time and attention to the prosecution of the business. They paid nothing for the stock, nor did Thompson pay, either in money or property, anything like its value. He put in only $16,000.00 in money and took part of that back out of the $50,000.00 loan. In favor of creditors there was a liability to pay the difference between the amount actually paid on the stock and its par value. Helliwell, Stock and Stockholders, sections 420, 421. It became necessary for Teter, Hall and Dayton to take upon themselves these burdens and hazards as a means of providing a purchaser for the Hall company property at a price sufficient to pay its debts. No profit was provided for in the contract. It does not appear that a better contract for that company could have been made. It was indebted to insolvency and all its stockholders personally endangered.

Thompson, a stranger to the Hall company, was willing to take stock in, and convey property to, and guarantee loans for, the Philippi company, on condition that the Hall company would convey to it all of its property in consideration of the assumption of its debts, and the further condition that the five stockholders should take substantial interests in the Philippi company. There was not, as in cases of re-organization or consolidation for profit, an agreement to pay the debts and a profit in addition, by an exchange of the stock of the old corporation for stock in the new. There is no evidence tending to prove that the stock in the new corporation was issued to these three parties for or in consideration of their stock in the old one. The financing of the new company was the creation of a purchaser for the hopelessly insolvent old one, on the terms set forth in the resolution and deed, and no other. The purchase of the assets of the old corporation on those terms was only one of the many things done by the six men who took hold of the Philippi company and provided it with means and credit sufficient to establish and prosecute a mining business. Additional coal, a better plant and a larger market were all necessary, and it took money to provide them and that money was furnished partly on the faith of the proposed sale of the assets of the Hall company for a sufficient amount of money to pay its debts and no more. In view of these considerations, we are of the opinion that the stock assigned to Teter, Hall and Dayton was not a profit derived from their stock in the Hall coal company, but mere stock taken by them in the Philippi Coal Mining Company upon new and independent considerations.

Stress is laid upon the fact that Kelly and Poling were active in the promotion of the interests of the Hall company while all the negotiations for the sale of its property were pending and until the consummation of the sale of its assets to the Philippi company, the former acting as superintendent and the latter as mine foreman or boss, but, for these services, they expected and had contracted for, compensation, and had, at the time of the rendition of this decree, actions at law pending for the recovery thereof.

For the reasons herein stated, the decree will be affirmed.

*Affirmed.*